[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON DEFENDANT'S MOTION TO OPEN AND MODIFY(NO. 150) AND PLAINTIFF'S MOTION TO OPEN JUDGMENT AND MODIFY CUSTODY(NO. 150)
Both parties, shortly after the ink dried on a detailed, painstakingly arrived at, joint custodial agreement concerning their three minor children, reached with the help of the special CT Page 9518 masters and Judge Steinberg at the Regional Family Trial Docket, have now moved to modify the `final' custody orders principally because the plaintiff mother wishes to relocate to West Virginia. She seeks permission to relocate the residence and school district of the children; on the other hand, the defendant father seeks an order that the children reside with him a majority of the time.
At the hearing on the motions, the parents and the children were represented by counsel. These witnesses testified: the parties, the family relations officer, Maret DiGangi; a licensed clinical psychologist, Dr. Robert Meier; the children's therapist, William Eyberse; Ronald Freedman, a vocational rehabilitation specialist; and Jane Dauphine, a friend of the father. Financial affidavit were submitted and a number of documents were introduced into evidence. The parents submitted written proposed orders and requested an opportunity to file post-hearing briefs. All counsel were ordered to file memoranda on or before August 17, 1995, and the attorney for the children was permitted to incorporate his proposed orders in his memorandum.
 I
From the evidence, I find as follows. The couple married October 8, 1982. The parties have three minor children, Kyle, born December 15, 1983; Alexandra (Ali), born November 23, 1986; and James, born August 4, 1988. The action seeking a dissolution was commenced by complaint returnable April 27, 1993. During the prejudgment proceedings, a plethora of motions were filed; commendably, the parties worked out a pendente lite custody/visitation/access schedule for the children, which involved them spending alternating weeks in the home of each parent.
After mediation, followed by an evaluation, investigation and recommendation by family services, and psychological evaluation and recommendation by Meier, the parties remained at issue on permanent custodial orders. The matter was referred to the Regional Family Trial Docket, an agreement was reached, and Judge Steinberg entered `permanent' custody orders on September 21, 1994.
As the parties could not agree on financial issues, this court heard testimony over several days and rendered a decision CT Page 9519 on December 13, 1994, dissolved the marriage, adopted Judge Steinberg's custodial orders, and entered child support and other financial orders. The parents were also ordered to complete the Parenting Education Program.
The defendant husband appealed this court's judgment to the Appellate Court. The pendency of the appeal stayed the financial orders save for child support and medical expense for the children.
 II
A number of post-trial motions were filed, in addition to the two here at issue, and the parties continue to maintain a high degree of animosity, bitterness and hostility to each other, the mother more so than the father. Each parent is fit and suitable, and each shows genuine care, love and concern for the children. Their ability to communicate with each other is poor; many of their attempts at discussion over issues, even when related to the children, are terminated abruptly. Often, the mother hangs up on the father during telephone calls. When she was with the children for an Easter vacation in West Virginia this past spring, she limited telephone communication between the children and father. And, at the outset of the action, in 1993, she planned to, and did, take the children to West Virginia to keep them from their father.
Dr. Meier recommended in 1993 that the parents engage in counseling to address "the behaviors that are preventing them from placing the needs of the children before their own. Mother's level of anger, suspiciousness and rigidity, however, needs to be specifically addressed, and her willingness to do so should be taken into account when the custody decision is made."
He also stated in his report that `every effort should be taken to insure that the children remain living within the State of Connecticut in order to prevent further disruption of their lives, and as a means of preventing impulsive or selfish actions by either parent'.
DiGangi's report, which was completed May 19, 1994, stated that she "has concerns about either parent's potential abuse of any sole custody orders. Father has accused mother of controlling his time with the children, but if father were to have sole custody, he would probably attempt to exert the same control over CT Page 9520 mother's interaction with the children. If mother were sole custodian, she would most likely move away from the area in order to free herself of father's influence. Such a move would not be in the children's best interests."
I conclude that these assessments by Meier and DiGangi were credible, and at the time prophetic, and, in all likelihood, led to Judge Steinberg's order that, "Joint legal custody of the minor children is . . . awarded to both parties. The parties shall jointly consult with each other regarding major decisions affecting the children. . . . This language does not confer primary custodianship on either party. e. Neither party shall relocate the residence of the children outside their present school district without further order of the court, unless agreed to by both parties."
Unfortunately, neither DiGangi nor Meier had occasion to see the children or the parties since their original evaluations and recommendations. However, DiGangi has the same concerns about relocating the children out of state and believed that it was very important to maintain continuity and stability in the children's lives, and that the three children should stay together as a unit. The court agrees.
 III
The mother basically claims that her move is dictated by economics. She claims that she was fired from her casino job because of a philosophical disagreement with her immediate supervisor, and because she applied for a better job in another department. She has found a suitable job in West Virginia, with the perquisite of a car, and has well-organized plans for housing, school and extracurricular activities for the children. Although she herself has not resided in that state since her high school graduation, she claims to have a support network there, which includes her mother and sister. She also points to the defendant's pending appeal of the financial orders as contributing to her financial difficulties. She asserts that the move would be in the children's best interests.
At the same time, she has made minimal effort to find employment in this region, and hence, has not shown she has been unable to. Although I agree that the defendant's appeal[1] has contributed somewhat to her financial difficulties (which the defendant himself recognized in his testimony and in his offer CT Page 9521 made the second day of the hearing), I believe that a significant factor in her job loss was her own behavior. This included her failure to take advantage of an employer `in-house' appeal or grievance procedure. Moreover, as she began planning this relocation no later than the early spring of 1995, I am not persuaded that the loss of her job is not pretextual.
Also, I cannot find from the totality of the circumstances that her claimed financial hardship is as extreme as she portrays it, in view of the $120,000 trust fund established for her. A complete description of the terms of the trust and her ability to receive funds therefrom was not provided to the court, and therefore, the court views her testimony about the nonavailability to her of the trust funds with some skepticism.
I have considered a number of factors in determining whether the best interests of the children would be advanced by the proposed relocation to West Virginia. These include: the stability and continuity of the original custody award; that the children's welfare is affected by the parents' welfare; whether the move would be likely to improve the general quality of life for the mother and children; whether the mother's motive for the move is for the express or implicit purpose of defeating the father's visitation; whether the mother will be likely to comply with father's post-relocation access periods and contact; whether the substitute (post-relocation) access provided the father would be adequate to foster a continual meaningful relationship between him and the children, and the preferences of the children, who in this case are bright, intelligent and articulate. I also consider the stance of the attorney for the children, who urges that the present custodial arrangement stay in effect and opposes the motion of each parent;[2] he asserts that the children are now "essentially stabilized emotionally and are functioning successfully within their present context in the state of Connecticut.
There can be no doubt that the strong bonds the children and the father have forged would be attenuated and weakened by the 550-mile geographical separation resulting from the proposed move.
He would no longer have the regular and frequent time he now spends with them, and they would no longer have the care and attention, support and guidance he consistently bestows upon them. I also conclude that while the mother's motive for moving CT Page 9522 may not be for the conscious purpose of depriving the father of his relationship with the children, her attitude and actions, as shown by past history, will adversely impact on his ability to maintain lines of communication with them. Although I cannot find from the record that she will likely not comply with post-relocation orders of visitation or access by father, I conclude that she will do little to enhance or improve his ability to visit with or see the children.
The children's preferences are divided. Kyle, the oldest boy, adamantly wishes to remain; Ali is willing to go, but not strongly; and the youngest child is ambivalent.
It is important to note that the mother broached the subject of moving to the children before discussing it with the father, despite her agreement (and the court order) that the parties `shall jointly consult with each other regarding major decisions affecting the children'.
I also find it quite telling that in her motion to modify custody, she makes no mention whatsoever of substitute access for father. In testimony, she suggested five weeks in the summer. It is the court's conclusion that under the circumstances of this case, five weeks in the summer, even the whole summer school vacation, expanded by holiday and occasional weekend visits during the year, would not be adequate to foster continuing and meaningful relationships between the father and his children.
The mother has stated she will not leave this state without her children, and if she remained, then the conflict between the parties would continue to the detriment of the children. While this may be so, remarkably, the children are, perhaps with the help of counseling, doing well under the present scenario. The older two excel in school and sports, and it appears that the youngest child will, too.
As the stability and continuity of a child's living arrangements are most important, it is my view that at this time, a move to West Virginia would be ill advised and decidedly not in the children's best interests. For these reasons, the mother's motion to open judgment and modify custody is denied.
The father's motion to open and modify custody is also denied. What the children and the parties need is a period of peace and stability. Peace treaties are possible, and it is CT Page 9523 imperative that for the sake of the children, the parties not continue to embroil the children in this litigation any further.
Teller, J.